J. Jonathan Hawk (254350)
jhawk@mcdermottlaw.com
Ari R. Swazer (359884)
aswazer@mcdermottlaw.com
**MCDERMOTT WILL & SCHULTE LLP**
2049 Century Park East, Suite 3200
Los Angeles, CA 90067-3206
Telephone: +1 310 277 4110
Facsimile: +1 310 277 4730

David P. Saunders (Admitted *pro hac vice)*
dsaunders@mcdermottlaw.com
**MCDERMOTT WILL & SCHULTE LLP**
444 West Lake Street, Suite 4000
Chicago, IL 60606-0029
Telephone: +1 312 372 2000
Facsimile: +1 312 984 7700

Attorneys for Defendant SUTTER HEALTH

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

CHRISTINA WASHINGTON, on behalf of herself and all others similarly situated,

Plaintiff,

v.

SUTTER HEALTH, a California nonprofit corporation; and DOES 1-100, inclusive,

Defendants.

CASE NO. 4:26-cv-03012

**DEFENDANT SUTTER HEALTH'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT (ECF NO. 32) PURSUANT TO FED. R. CIV. P. 12(B)(1); MEMORANDUM OF POINTS AND AUTHORITIES**

*[Filed concurrently with Declaration of Dr. Veema Jones; Declaration of Braden Carkhuff; [Proposed] Order]*

Date: October 8, 2026
Time: 2:00 p.m. PT
Courtroom: Courtroom 2, 4th Floor (Oakland)
Judge: Haywood S. Gilliam, Jr.

**TABLE OF CONTENTS**


I. INTRODUCTION ....... 1

II. STATEMENT OF ISSUES TO BE DECIDED ....... 5

III. BACKGROUND ....... 5

A. Sutter and Its Operations ....... 5

B. Patient Visit Documentation Processes ....... 6

1. Role and Necessity of Documenting Patient Visits ....... 6

2. Sutter's Notice of Privacy Practices Informs Patients of Its Use of Business Associates for Transcription ....... 7

C. Abridge's Functionalities and BAA with Sutter ....... 8

1. The Abridge Platform as a Clinical Documentation Program ....... 8

2. Sutter's BAA with Abridge as a Business Associate ....... 9

D. Plaintiff's Allegations ....... 10

IV. LEGAL STANDARD ....... 11

V. ARGUMENT ....... 12

A. Plaintiff Lacks Standing Because the Abridge Platform Was Not Used During the Encounters She Identifies in Her Complaint ....... 12

B. Even If the Abridge Platform Were Used, Plaintiff Would Still Lack Standing ....... 13

1. Plaintiff Does Not and Cannot Show Injury-in-Fact ....... 14

a. Plaintiff Did Not Have a Reasonable Expectation of Privacy ....... 15

b. Plaintiff Cannot Show Any Intrusion ....... 17

c. Plaintiff Cannot Show Any Public Disclosure of Her Information ....... 18

d. Plaintiff Cannot Show Any Highly Offensive Intrusion ....... 19

e. Plaintiff Cannot Show Any Emotional or Economic Harm ....... 21

VI. CONCLUSION ....... 22


McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allen v. Novant Health, Inc.*,
2023 WL 5486240 (M.D.N.C. Aug. 24, 2023) ........ 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 12, 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 12, 21

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024) ........ 2, 11, 12

*Cannara v. Nemeth*,
467 F. Supp. 3d 877 (N.D. Cal. 2020) ........ 12

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
631 F.3d 939 (9th Cir. 2011) ........ 5, 13

*Cohen v. Facebook, Inc.*,
798 F. Supp. 2d 1090 (N.D. Cal. 2011) ........ 21, 22

*Daniel v. Nat'l Park Serv.*,
891 F.3d 762 (9th Cir. 2018) ........ 14

*In re Facebook Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ........ 21, 22

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........ 14

*Friends of the Earth v. Sanderson Farms, Inc.*,
992 F.3d 939 (9th Cir. 2021) ........ 12

*Gastelum v. Blue Diamond Hosp. LLC*,
2023 WL 3958898 (N.D. Cal. June 12, 2023) ........ 12

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ........ 15, 16, 17

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ........ 19

*Hertz Corp. v. Friend*,
559 U.S. 77 (2010) ........ 12



MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

*Hill v. NCAA*,
7 Cal. 4th 1 (1994) .....20

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
48 F.4th 1236 (11th Cir. 2022) .....18, 19

*Ingraham v. Cap. One Fin. Corp.*,
2026 WL 1755170 (N.D. Cal. May 22, 2026) .....15

*Leite v. Crane Co.*,
749 F.3d 1117 (9th Cir. 2014) .....12

*Libman v. Apple, Inc.*,
2024 WL 4314791 (N.D. Cal. Sept. 26, 2024) .....15

*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .....14

*Maghoney v. Dotdash Meredith, Inc.*,
2026 WL 497402 (S.D. Cal. Feb. 23, 2026) .....21

*Manzanarez v. Madera Collection Servs.*,
722 F. Supp. 3d 1074 (E.D. Cal. 2024) .....14

*Martinez v. Newsom*,
46 F.4th 965 (9th Cir. 2022) .....11

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) .....12

*McCann v. Iroquois Mem. Hosp.*,
622 F.3d 745 (7th Cir. 2010) .....18

*McCarthy v. United States*,
850 F.2d 558 (9th Cir. 1988) .....12

*McNamar v. Experian Info. Sols., Inc.*,
2026 WL 1603306 (N.D. Cal. June 4, 2026) .....15, 18

*In re Meta Pixel Tax Filing Cases*,
793 F. Supp. 3d 1147 (N.D. Cal. 2025) .....15

*Myers v. Dick's Sporting Goods, Inc.*,
2026 WL 1045528 (E.D. Cal. Apr. 17, 2026) .....19

*Nienaber v. Overlake Hosp. Med. Ctr.*,
733 F. Supp. 3d 1072 (W.D. Wash. 2024) .....17

*Polo v. Innoventions Int'l, LLC*,
833 F.3d 1193 (9th Cir. 2016) .....13

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) ....................14, 15, 16

*Saedi v. SPD Swiss Precision Diagnostics GmbH*,
2025 WL 1141168 (C.D. Cal. Feb. 27, 2025)....................17

*Shulman v. Grp. W Prods., Inc.*,
18 Cal. 4th 200 (1998) ....................15

*Smith v. Radius Global Sols., LLC*,
2023 WL 6373874 (C.D. Cal. Sept. 25, 2023) ....................19

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)....................11, 14

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021).................... *passim*

*United States v. Azure*,
801 F.2d 336 (8th Cir. 1986) ....................18

*Whalen v. Roe*,
429 U.S. 589 (1977)....................18

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) .................... *passim*

**Statutes**

Cal. Bus. & Prof. Code § 2266 ....................6

Cal. Civ. Code § 56....................4, 11, 20

CIPA § 632 ....................11

**Other Authorities**

42 C.F.R. § 482.24....................6

45 C.F.R. § 164.308....................9

45 C.F.R. § 164.310....................9

45 C.F.R. § 164.312....................9

45 C.F.R. § 164.410....................9

45 C.F.R. § 164.502....................4, 9, 20

45 C.F.R. § 164.504....................9



MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

45 C.F.R. § 164.520 ....7, 17, 20

Fed. R. Civ. P. 12(b)(1).... *passim*

Fed. R. Civ. P. 12(b)(6)....15, 20

Georgia Garvey, *Health Systems Help Doctors Bogged Down by Administrative Burdens*, Am. Med. Ass'n (Dec. 10, 2024), https://www.ama-assn.org/practice-management/physician-health/health-systems-help-doctors-bogged-down-administrative-burdens....8

Restat. (2nd) of Torts § 652D (1977)....18

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 8, 2026 at 2:00 p.m. PT, or as soon thereafter as counsel may be heard, we shall appear before the Honorable Haywood S. Gilliam, Jr., or any judge sitting in his stead in courtroom 2 of the Ronald V. Dellums Federal Building & United States Courthouse, 1301 Clay Street, Oakland, CA 94612, and shall then and there present *Sutter Health's Motion to Dismiss Plaintiff's Second Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1)*.

Defendant Sutter Health ("Sutter"), by and through its undersigned counsel, moves to dismiss Plaintiff Washington's ("Plaintiff") Second Amended Complaint (ECF No. 32, "SAC"), pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1), on the basis that Plaintiff has not pleaded and cannot show Article III standing for any of her claims.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This is Plaintiff Christina Washington's third complaint. And the allegations added to the SAC in efforts to save her claims actually confirm that *none* of them can proceed past the pleading stage. The original Complaint (ECF No. 1, "Orig. Compl.") named three plaintiffs. Two were voluntarily dropped from this case after Sutter's prior motion to dismiss the Original Complaint under Rule 12(b)(1) showed with evidence that neither had standing to assert claims against it. *See* ECF No. 25. The only plaintiff that remains is Plaintiff Washington, who continues to assert the same insufficient allegations to claim that her privacy interests were invaded by Sutter's use of the Abridge AI, Inc. ("Abridge") platform to record clinical visits and generate the beginnings of clinical notes. SAC ¶ 1. Those allegations do nothing to address Sutter's previous factual challenge under Rule 12(b)(1) that showed Plaintiff Washington lacks standing, *i.e.*, because she has no reasonable expectation of privacy, has not suffered any intrusion or dissemination of her information, much less one that was highly offensive, and cannot identify any emotional or economic harm.

Moreover, the information Plaintiff now adds about her encounters shows that any Sutter provider who may have spoken to Plaintiff in connection with the three visits she identifies in her complaint ([redacted] did *not* have access to the Abridge platform. *See* SAC ¶ 32; Declaration of Braden Carkhuff ("Carkhuff Decl."), ¶¶ 10–13. She thus could not have experienced



MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

any of the harm she alleges. And even if the Abridge platform had been used during any of the visits she identifies, Plaintiff now makes key concessions in the SAC that go even further to preclude standing—they *admit* Plaintiff was, in fact, aware a recording device was being used, was informed of its purpose, and still chose to proceed with her medical visit. If that were not enough, Sutter's records demonstrate that Plaintiff signed a form acknowledging Sutter's Notice of Privacy Practices (which disclosed the use of business associates like Abridge to perform transcription services) *on three occasions*, well before the visits she identifies in her complaint. Carkhuff Decl. ¶ 14.

The SAC continues to allege that Sutter's use of the Abridge platform caused Plaintiff actionable, *intangible* injury in the form of privacy violations under the California Invasion of Privacy Act ("CIPA"), California's Confidentiality of Medical Information Act ("CMIA"), the Unfair Competition Law ("UCL"), the Electronic Communications Privacy Act ("ECPA"), and the common-law tort of intrusion upon seclusion. SAC ¶¶ 73–135. Each claim attempts to analogize the use of the Abridge platform to a form of wiretapping and complains that Plaintiff never provided consent to her providers for the use of the Abridge platform. *Id.* But Plaintiff now admits she was aware of the recording and that she takes no issue with her physician documenting her visits, as she knows it is commonplace for healthcare providers to create notes of patient visits. *Id.* ¶ 12 (p. 7).[1] The claims being asserted in the SAC are thus about the particular *tool* used for transcription of her medical encounter, *not* the recording or transcription itself.

For Plaintiff to have Article III standing, she must show—as to *each* claim—"(i) that [s]he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1142 (9th Cir. 2024) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). To show an injury in fact for a privacy-related harm (like Plaintiff's claims here), she must plausibly analogize the alleged injury to a harm traditionally recognized at common law. *TransUnion*, 594 U.S. at 423. The touchstones of privacy torts, including

[1] The SAC (like the Original Complaint) contains duplicative paragraph numbers. Where multiple paragraphs have the same number, Sutter provides the SAC page number to identify the paragraph.



MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

invading a zone where someone has a reasonable expectation of privacy, are absent here.

Whereas the Original Complaint claimed Plaintiff did not know that her clinical visit at Sutter was being recorded (*see* ECF No. 1, ¶ 6 (p. 1), ¶ 34), she has now taken a completely contradictory position in the SAC, admitting she "*personally observed* a provider use a microphone enabled electronic device" that "was used to capture her speech for transcription or note creation" during a medical visit. SAC ¶ 6 (p. 2) (emphasis added), ¶ 34. Plaintiff further concedes her provider told her, in real time, the device was being used "for transcription or for taking notes." *Id.* ¶ 6 (p. 2). Plaintiff, however, does not claim she asked questions, objected, or declined to proceed; she simply continued the encounter with the benefit of that knowledge. *Id.* ¶¶ 5–8 (p. 1–2), ¶¶ 32–37. She admits that she "expected ordinary clinical documentation." *Id.* ¶ 77. And Plaintiff also admits that she "reasonably understood that participating healthcare personnel would hear her statements and that relevant information would be entered into her medical chart." *Id.* ¶ 35. These are not the allegations of a person whose private affairs were secretly invaded. They are admissions that Plaintiff knowingly participated in the routine, observable, and disclosed documentation of her clinical visit. Those admissions negate her ability to show a concrete injury to her privacy interests, and thus preclude Article III standing.

With those concessions, Plaintiff's theory appears to be that she expected her medical record would be produced by "an internal method" rather than "a separately operated ambient AI platform." *Id*. ¶ 6 (p. 2). That is not a privacy interest. It is her preference about the vendor or tool used to create a record that she knew was being made. But even on her own allegations, the contents of her visit reached exactly the audience she expected: her provider, her chart, and personnel within the chain of healthcare delivery. *Id.* ¶¶ 35, 43–45, 77.

Sutter again brings a factual attack under Rule 12(b)(1) so that the Court is not confined to Plaintiff's allegations in assessing standing. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). The declarations and exhibits filed with this motion confirm what the SAC concedes: Sutter's use of the Abridge platform is part of routine clinical documentation. A microphone-enabled device captures the visit; software drafts the beginnings of a clinical note; and the physician reviews and finalizes the note for the patient's medical record. Declaration of Veena Jones, M.D. ("Jones Decl."), ¶ 15. The



MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

fact that the Abridge platform is used in this process does not change the routine and expected nature of the transcription process. Abridge is a HIPAA business associate operating under a Business Associate Agreement with Sutter. Carkhuff Decl. ¶ 4. Abridge is thus precisely the type of service provider that, under both federal and California law, is expressly allowed to receive patient information and can be involved in the delivery of healthcare services. *See* 45 C.F.R. § 164.502(e)(1); Cal. Civ. Code § 56.10(c)(3).

Moreover, Sutter's Notice of Privacy Practices ("NPP") tells every patient that certain healthcare services—including "transcribing your medical record"—are provided through such business associates. Ex. 2 to Carkhuff Decl. at 7; Ex. 3 to Carkhuff Decl. at 4. The SAC now expressly acknowledges the NPP. *See, e.g.*, SAC ¶ 81. And Plaintiff does not contend that she never had access to it or viewed it. Nor can she; she signed a form expressly acknowledging Sutter's NPP on [redacted] Carkhuff Decl. ¶ 14. This further precludes any claim that she was unaware of the practice being challenged here.

The SAC thus fails the injury-in-fact requirement for standing many times over, as Plaintiff cannot meet any of the elements of the privacy torts that form the basis for her suit. First, Plaintiff did not see a Sutter provider who had access to the Abridge platform during any of the three visits she identifies in her complaint. Carkhuff Decl. ¶¶ 10–13. But even if she did, her own allegations preclude her ability to show standing: even a plaintiff who merely "should know" of a documentation practice, and proceeds anyway, lacks a reasonable expectation of privacy. A plaintiff who claims she *watched* the practice occur, was told what it was, and continued her clinical visit without objecting certainly lacks one. SAC ¶¶ 6, 8 (p. 2), ¶ 34. Moreover, Sutter's written and publicly-available NPP (which Plaintiff was provided and acknowledged on three occasions prior to her visits) expressly disclosed that business associates are used in services like transcription. Carkhuff Decl. ¶¶ 5–9, 14; Ex. 2 to Carkhuff Decl. at 7; Ex. 3 to Carkhuff Decl. at 4.

Nor was there any "intrusion," as Sutter was the intended participant in Plaintiff's conversation. SAC ¶ 35. The use of the Abridge platform in fact *reduced* the number of people with eyes on Plaintiff's information, compared to the traditional documentation chain she concedes she

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

expected. *Id.* ¶ 77; Jones Decl. ¶¶ 9–16.

Plaintiff also cannot show any harm to her privacy interests based on any public disclosure of private facts, given that the SAC disclaims any "subsequent public dissemination" of her information. SAC ¶ 39.

Moreover, nothing in Sutter's conduct was "highly offensive." According to Plaintiff, her provider accurately described the function of a visible device used to generate a record of her medical visit. *Id.* ¶¶ 6, 8 (p. 2). The use of a tool to generate a medical record—aimed at facilitating and improving patient care—is far from conduct courts deem highly offensive.

Finally, Plaintiff cannot identify any concrete harm. Her allegations of emotional and economic harm are boilerplate, copied nearly verbatim from the Original Complaint. *Compare* Orig. Compl. ¶ 97, *with* SAC ¶ 120; *see also* SAC ¶¶ 61, 85. And the SAC recites the elements of standing as though they were facts. Such legal "labels and conclusions" are entitled to no weight. *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 955 n.9 (9th Cir. 2011) (en banc).

Three complaints into this case, Article III standing is farther from Plaintiff's reach than when she initiated this suit. The Abridge platform was not used during the visits she identifies in her complaint. But even if it had been, Plaintiff's own amendments establish that she knew her visits were being recorded for transcription, expected them to be documented and shared, and proceeded anyway. SAC ¶¶ 6, 8 (p. 2), ¶¶ 34–35, 77. What she challenges is thus the lawful, disclosed, and statutorily sanctioned manner in which routine healthcare documentation was performed. The Constitution does not extend federal jurisdiction to that grievance. The SAC should be dismissed under Rule 12(b)(1) for lack of Article III standing.

## II. STATEMENT OF ISSUES TO BE DECIDED

Whether Plaintiff can demonstrate Article III standing for all of her claims as required to maintain this case.

## III. BACKGROUND

### A. Sutter and Its Operations

Founded in 1921 and headquartered in Northern California, Sutter is a not-for-profit healthcare system committed to advancing care for everyone. Jones Decl. ¶ 3. Sutter's integrated health system

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

offers a connected care model that delivers treatment when, where, and how people need it. *Id.* ¶ 4. Through its more than 14,000 clinicians and 57,000 employees, Sutter provides patients with coordinated care at its 27 hospitals, more than 200 clinics, and more than 40 outpatient, imaging and surgery, and home service centers across Northern and Central California. *Id.* As part of its mission to achieve higher levels of care quality and deliver stronger healthcare outcomes, Sutter has implemented new technologies in multiple facets of patient care, recognizing that these new technologies increase the speed and improve the accuracy with which many diseases can be diagnosed and enable its caregivers to dedicate more of their time to patient care. *Id.*

### B. Patient Visit Documentation Processes

#### 1. Role and Necessity of Documenting Patient Visits

Pursuant to state and federal regulations, providers are required to create records of patient visits. *See, e.g.*, 42 C.F.R. § 482.24(c); Cal. Bus. & Prof. Code § 2266. Healthcare provider notes are increasingly shared directly with patients, empowering them to actively track their symptoms, review care instructions, and participate more actively in managing their health. Jones Decl. ¶ 13. It follows that documenting patient encounters is a routine and essential component of healthcare. *Id.* ¶ 8. The manner in which that documentation is performed nevertheless varies. Healthcare providers have, for example: created handwritten or typed notes during or after a patient visit; had a colleague sit through a patient visit to write or type notes; and/or dictated notes. *Id.* ¶ 9. Written or dictated notes are often then passed to other personnel to review, organize, and type into a final set of notes to be placed into the patient file. *Id.*

It is also a routine part of modern medicine that patient records are shared among care teams, specialists, and support staff to ensure appropriate record-keeping and coordinated treatment. *Id.* ¶ 10. To illustrate, it is common for a patient to first meet with a medical assistant during a visit who reviews the patient's file, discusses their health issues, and takes notes. That medical assistant may then discuss that encounter with a doctor, who reviews the patient's notes, meets with the patient, takes their own notes, and further discusses the visit with other personnel (who also may review the file) in connection with planning treatment steps, discharging the patient, and ensuring proper record-keeping. *Id.* The patient's file may then be shared with further healthcare providers to consult on potential

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

treatments or diagnoses. *Id.* ¶ 11. It may also be shared with billing vendors, electronic health record providers, administrative personnel, and insurance providers in connection with various administrative tasks. *Id.* Ultimately, all of these steps are reflected in the patient's electronic medical record, which is hosted by a third-party service provider. In other words, the involvement of additional personnel or service providers in documentation and subsequent review of patient files is not new; it is how healthcare is delivered. *Id.* ¶¶ 9–14.

Documenting patient encounters is important to the provision of high-quality care, but it imposes significant burdens on healthcare providers. Throughout the healthcare industry, administrative burden has been widely recognized as a major contributor to provider fatigue and burnout, reducing the time clinicians can devote to direct patient care. *Id.* ¶ 14.

**2. Sutter's Notice of Privacy Practices Informs Patients of Its Use of Business Associates for Transcription**

To support administrative functions involved in patient care, healthcare providers have long relied on third-party business associates such as vendors, contractors, and others that perform services for healthcare providers. In supporting healthcare providers, these business associates create, receive, maintain, or transmit protected health information ("PHI"), *i.e.*, patient data. Under HIPAA, covered entities must provide patients an NPP that explains the use and disclosure—including to business associates—of protected health information. *See* 45 C.F.R. § 164.520.

Sutter provides patients with its NPP, which explains how Sutter and its affiliates use and disclose patient PHI. *See* Ex. 2 to Carkhuff Decl. (Sutter's current NPP) at 7; Ex. 3 to Carkhuff Decl. (Prior version of Sutter's NPP) at 4. Sutter's NPP states:

> There are some services provided in our organization through contracts with business associates. Examples include transcribing your medical record, surveying for patient satisfaction and a copy service we use when making copies of your health record. When services are provided by contracted business associates, we may disclose the appropriate portions of your health information to them so they can perform the job we have asked them to do. However, our business associates are also required by law to safeguard your information.

*See* Ex. 2 to Carkhuff Decl. at 7; Ex. 3 to Carkhuff Decl. at 4; *see also* Carkhuff Decl. ¶¶ 5–7. Sutter's NPP is publicly available on its website. Carkhuff Decl. ¶ 8.

Plaintiff was provided with a copy of the NPP and signed a form acknowledging its receipt on [redacted] Carkhuff Decl. ¶ 14. The SAC also acknowledges the existence of the NPP and does not claim that Plaintiff did not have access to it or did not view it. SAC ¶ 81.

### C. Abridge's Functionalities and BAA with Sutter

#### 1. The Abridge Platform as a Clinical Documentation Program

Sutter implemented the Abridge platform to support clinical documentation, ease administrative burden and thereby enable its providers to spend more of their time providing care—all as part of its larger mission of improving patient care and expanding access to care. Jones Decl. ¶¶ 15–16. Initially, Sutter provided certain affiliated physicians with access to the Abridge platform for a clear clinical purpose: to support the provision of care while reducing the documentation burden driving physician burnout. *See id.* ¶¶ 14–15, 18. Sutter's decision in this regard reflects an industry-wide effort to reduce administrative burden on healthcare providers while improving accuracy and patient engagement.[2] And as even Plaintiff concedes, the Abridge platform enables Sutter-affiliated physicians to achieve those goals. *See* SAC ¶ 17; *accord* Jones Decl. ¶ 18.

The Abridge platform works in three steps: (1) a microphone-enabled device captures the audio of a patient visit; (2) Abridge, without the need to involve any human, generates a transcript of that audio and drafts the beginnings of a clinical note; and, (3) the physician reviews, edits, and finalizes the draft before it is added to the patient's medical file. *See* Jones Decl. ¶ 15. A patient can opt out of the use of the Abridge platform at any time by asking their provider to stop using the platform. *Id.* ¶ 17.

Sutter's implementation of the Abridge platform and similar technologies has returned more than one million working hours to employees and physicians—time that clinicians can, in turn, devote to patient care. *See* Ex. 1 to Jones Decl. (Sutter's 2024 Annual Report) at 53. The use of the Abridge platform brings another benefit: it enhances patient privacy by replacing humans who would serve as

---

[2] Georgia Garvey, *Health Systems Help Doctors Bogged Down by Administrative Burdens*, Am. Med. Ass'n (Dec. 10, 2024), https://www.ama-assn.org/practice-management/physician-health/health-systems-help-doctors-bogged-down-administrative-burdens.



MCDERMOTT WILL & SCHULTE LLP ATTORNEYS AT LAW LOS ANGELES

transcriptionists of handwritten or dictated notes of patient visits with automated processes, thereby reducing the number of people who otherwise would have eyes on notes of a patient's visit.

**2. Sutter's BAA with Abridge as a Business Associate**

Federal law expressly recognizes the long-standing and central role of third-party service providers in performing essential healthcare functions. *See* 45 C.F.R. § 164.502(e)(1). HIPAA business associates can permissibly receive and process patient information pursuant to the terms of binding Business Associate Agreements ("BAAs") that limit how patient information can be used or disclosed by the business associate. *See* 45 C.F.R. § 164.504(e)(2). HIPAA BAAs require business associates to implement administrative, technical, and physical safeguards to protect patient information from misuse or unauthorized access. *See* 45 C.F.R. §§ 164.308, 164.310, 164.312. They also impose affirmative obligations on the business associate to report any unauthorized use or disclosure. *See* 45 C.F.R. § 164.410.

Sutter has a BAA with Abridge, executed before Sutter provided affiliated physicians access to the Abridge platform. *See* Carkhuff Decl. ¶ 4; Ex. 1 to Carkhuff Decl. (BAA). The BAA between Sutter and Abridge supplies the legal and contractual framework governing how Abridge must protect PHI while supporting Sutter's healthcare operations.

Sutter's BAA with Abridge imposes obligations governing Abridge's receipt, use, disclosure, and safeguarding of patient PHI. *See* Ex. 1 to Carkhuff Decl. (BAA). For example, it requires Abridge to perform its services "in strict compliance with HIPAA, California law, and all other applicable laws." *Id.* § 2. It prohibits Abridge from using or disclosing PHI, except as necessary to provide services to Sutter or as otherwise permitted by HIPAA, and bars Abridge from receiving remuneration in exchange for Sutter patients' PHI. *Id.* §§ 2(j), 3. The BAA also requires Abridge to implement and maintain safeguards designed to protect the confidentiality and security of patient PHI, including administrative, technical, and physical safeguards, and it imposes reporting obligations for unauthorized uses or disclosures. *Id.* §§ 2(a)–(c). Abridge's Privacy Policy publicly acknowledges these limitations, stating that Abridge processes patient information "solely on behalf of" its covered entity customers and under its BAAs. *See* Ex. A (Abridge's Privacy Policy) at 1.

**D. Plaintiff's Allegations**

Plaintiff alleges she received medical care from Sutter-affiliated providers in California on November 21, 2025, December 9, 2025, and March 2, 2026. SAC ¶ 32. She claims at least one of those visits was by telehealth, although she does not specify when this visit occurred or whether she contends the Abridge platform was used during that visit. *See id.* [redacted] Carkhuff Decl. ¶ 12. [redacted] and that any provider who may have spoken to Plaintiff in connection with these contacts did <u>not</u> have access to the Abridge platform. *Id.* ¶¶ 12–13. As a result, the Abridge platform could not have been used during the encounters Plaintiff identifies in her complaint.

Nevertheless, Plaintiff vaguely alleges that "[d]uring at least one encounter, [she] personally spoke with a Sutter healthcare provider about private health matters while a microphone-enabled electronic device was used to capture speech for transcription or note creation." SAC ¶ 34. Crucially, Plaintiff admits that she "personally observed" the use of the "microphone enabled electronic equipment while she spoke." *Id.* ¶ 6 (p. 2). She then admits that "[t]he provider described the equipment as being used for transcription or for taking notes." *Id.* She also admits that she "reasonably understood that participating healthcare personnel would hear her statements and that relevant information would be entered into her medical chart." *Id.* ¶ 35.

Because Plaintiff admits she knew her encounter was recorded and transcribed, her claims boil down to the allegation that she "did not understand that an ambient-AI service operated through a separate technology company would receive the live conversation." *Id.* She thus challenges the particular *tool* used for the transcription of her medical encounter, not the *fact* that it was recorded and transcribed. And even though she complains of Sutter's use of the Abridge platform, she does not contend that her information was disclosed to anyone other than her healthcare provider team or that it was used for anything other than to create a record of her medical visit. *Id.* ¶¶ 38–39.

Plaintiff's remaining allegations are a web of speculation and leave too much for the Court to fill in, even at the pleading stage. For instance, each allegation in the SAC concerning Sutter's use of



MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

the Abridge platform and how the platform functions is made on "information and belief."[3] *Id.* ¶¶ 15, 27, 45, 50–54, 92. Moreover, the SAC does not identify a single statement made by Plaintiff that was purportedly recorded by the Abridge platform.[4] At most, Plaintiff alleges generally that the recording and transcript of her visit with healthcare providers contain individually identifiable medical information, including symptoms, diagnoses, medications, treatment plans, and medical history. *Id.* ¶ 2 (p. 4).

Based on this, Plaintiff asserts claims under Section 632 of CIPA, Sections 56.10 and 56.11 of CMIA, UCL, and ECPA, as well as a common-law claim for intrusion upon seclusion. *Id.* ¶¶ 73–135. Plaintiff also seeks to represent a nationwide class and a California subclass. *Id.* ¶¶ 64, 69–72. But she identifies no concrete, particularized injury, and therefore no Article III basis for this Court to exercise jurisdiction.

## IV. <u>LEGAL STANDARD</u>

Article III standing is a jurisdictional prerequisite, and "[t]o satisfy Article III's case or controversy requirement, a plaintiff must establish that she has standing to invoke the jurisdiction of the federal courts." *Bowen*, 118 F.4th at 1142 (citing *TransUnion*, 594 U.S. at 423). "To do so, [the plaintiff] must show (i) that [s]he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* (quotations and citations omitted); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff must establish Article III standing individually as to *each* claim asserted. *Martinez v. Newsom*, 46 F.4th 965, 970 (9th Cir. 2022).

Each element can be challenged at the pleading stage via a motion under Rule 12(b)(1), as either a facial attack or a factual attack with evidence. *Bowen*, 118 F.4th at 1142–43. In the context of a factual attack—such as Sutter's motion here—the defendant can rely both on the complaint's

[3] The Court need not rely on such unsupported allegations where the record contradicts Plaintiffs' allegations. *White*, 227 F.3d at 1242. The Court may properly consider evidence beyond the face of the complaint where a defendant raises a factual attack on a motion to dismiss under Rule 12(b)(1). *Id.*

[4] The SAC alleges that this information is in Sutter's possession, *see* SAC ¶ 47, but Plaintiff has access to her own medical records, and she does not allege otherwise

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

allegations[5] and extrinsic evidence. *Gastelum v. Blue Diamond Hosp. LLC*, 2023 WL 3958898, at *3, *5 n.1 (N.D. Cal. June 12, 2023). Once the defendant has "contested 'the truth of the plaintiff['s] factual allegations,' the plaintiff has the burden 'to support her jurisdictional allegations with competent proof'" and by a preponderance of the evidence. *Bowen*, 118 F.4th at 1142–43 (quoting *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 944 (9th Cir. 2021)); *see also Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010); *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

In a factual challenge to jurisdiction, the Court does *not* presume the truth of the complaint's allegations. *White*, 227 F.3d at 1242. The Court can weigh the parties' evidence and resolve factual disputes that bear on the jurisdictional issue, provided that they are not "intertwined with the merits of the claim." *Bowen*, 118 F.4th at 1143; *see also McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988); *Cannara v. Nemeth*, 467 F. Supp. 3d 877, 882 (N.D. Cal. 2020); *Gastelum*, 2023 WL 3958898, at *5. If a plaintiff fails to carry its burden to satisfy *all* three elements of Article III standing, the claim must be dismissed. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

## V. ARGUMENT

### A. Plaintiff Lacks Standing Because the Abridge Platform Was Not Used During the Encounters She Identifies in Her Complaint

Plaintiff lacks standing for a threshold reason: she alleges she had three medical encounters at Sutter, but Sutter's records show that any provider who may have spoken to Plaintiff in connection with those contacts *did not have access to the Abridge platform*. Carkhuff Decl. ¶ 13. Because each of Plaintiff's claims rests on the allegation that Sutter used the Abridge platform to transcribe the clinical visits she identifies in her complaint, and because the Abridge platform could not have been used during those visits, she lacks standing.

Article III requires plaintiffs to show that they *personally* suffered the alleged injury. A plaintiff cannot rely on generalized allegations or injuries suffered by others. *TransUnion LLC*, 594 U.S. at 423. The Supreme Court illustrated this principle in *TransUnion*, where putative class

---

[5] A complaint's allegations must still satisfy relevant pleading standards; labels, conclusions, and formulaic recitations of elements do not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

members whose erroneous credit reports were disseminated had standing, but those whose reports were never shared did not. *Id.* at 439. Where the alleged conduct did not affect the plaintiff, there can be no injury in fact. *See Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193 (9th Cir. 2016) (affirming dismissal where plaintiff "cannot have been injured in the manner in which she alleges").

That is precisely the case here. Sutter's initial deployment of the Abridge platform was only to certain providers, who had to be granted access to use the platform. Carkhuff Decl. ¶ 3. Without that access, Sutter providers could not use the platform. *See id.* Sutter's records reflect that any provider who may have spoken to Plaintiff in connection with the three visits she identifies in her complaint did not have access to the Abridge platform. *Id.* ¶ 13. Plaintiff's conclusory allegations that her privacy rights were violated by Sutter's use of the Abridge platform, *see, e.g.*, SAC ¶¶ 21–22, are thus baseless and must be disregarded in light of Sutter's evidence. *See White*, 227 F.3d at 1242 (the court "may look beyond the complaint" and "need not presume the truthfulness of the plaintiffs' allegations" when considering a factual attack under Rule 12(b)(1)). Because Plaintiff's clinical visits were not recorded using the Abridge platform, she lacks Article III standing, and her claims against Sutter must be dismissed.

**B. Even If the Abridge Platform Were Used, Plaintiff Would Still Lack Standing**

Even if the Abridge platform were used during Plaintiff's encounters, she would still lack standing based on her own allegations. She alleges that she watched a visible device capture her speech, was told by her provider that the device was being used for transcription, and continued speaking without objection—all while conceding that she expected her visit to be documented and shared within her care team. SAC ¶¶ 6, 8 (p. 2), ¶¶ 34–35, 77. Those allegations negate every element of the privacy torts on which her standing depends, and what little the SAC offers beyond them is conclusory boilerplate.

The way the SAC attempts to plead around these defects is itself revealing. Rather than plead facts and leave the standing analysis to the Court, the SAC recites the barebones elements of Article III standing as though they were factual allegations. *Id.* ¶¶ 40–42, 62. These are legal conclusions dressed up as factual allegations, and they are entitled to no weight. "To sufficiently allege standing, [a plaintiff] must do more than offer labels and conclusions." *Chapman*, 631 F.3d at 955 n.9

(quotations and citations omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (disregarding "conclusory allegations" of standing); *Daniel v. Nat'l Park Serv.*, 891 F.3d 762, 765, 767 (9th Cir. 2018) ("naked assertions fail [the Ninth Circuit's] edict that a plaintiff may not rely on a bare legal conclusion to assert injury-in-fact" (quotations and citations omitted)); *Manzanarez v. Madera Collection Servs.*, 722 F. Supp. 3d 1074, 1080–81 (E.D. Cal. 2024) (giving "no weight" to the allegation that plaintiff "suffer[ed] [a] concrete and particularized harm" due to a statutory right, and to his "barebones and conclusory" allegations of financial, reputational, and emotional harm).

When the SAC's element-tracking paragraphs are set aside—as they must be on a factual attack in which the Court does not presume the truth of the pleading, *White*, 227 F.3d at 1242—what remains are allegations that not only fall short of establishing Article III standing, but negate it.

### 1. Plaintiff Does Not and Cannot Show Injury-in-Fact

To establish an injury-in-fact sufficient to support standing, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized,'" *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 597 (9th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 339), and "actual or imminent, not conjectural or hypothetical." *Spokeo*, 578 U.S. at 339. A concrete injury must be "real" and not "abstract." *In re Facebook*, 956 F.3d at 598 (quotations and citations omitted).

"Various intangible harms can also be concrete." *TransUnion*, 594 U.S. at 425; *see also Spokeo*, 578 U.S. at 340. "Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts[,] . . . for example, reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion*, 594 U.S. at 425 (citations omitted). Nonetheless, a mere statutory violation is insufficient. *Spokeo*, 578 U.S. at 341. A plaintiff does *not* "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right;" a court must still "independently decide whether a plaintiff has suffered concrete harm under Article III." *TransUnion*, 594 U.S. at 426; *see also Popa v. Microsoft Corp.*, 153 F.4th 784, 792 (9th Cir. 2025).

Specifically, when a plaintiff alleges an intangible harm, courts must look to the specific



MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

alleged underlying harm and compare it, in detail, to substantive features and *specific elements* of the common-law tort. *Popa*, 153 F.4th at 791–92. Comparing the alleged injury to common law privacy rights "at a high level of generality" is not a proper analysis under *TransUnion*. *Id.* at 792. For example, if a plaintiff's allegations in a privacy case fail to explain what was "'highly offensive' or 'embarrassing,' invasive, or otherwise private'" in a manner that comports with a common law claim, the plaintiff has failed to establish injury in fact for an invasion of privacy. *Id.* at 791; *see also McNamar v. Experian Info. Sols., Inc.*, 2026 WL 1603306, at *4 (N.D. Cal. June 4, 2026) (Gilliam, J.); *Ingraham v. Cap. One Fin. Corp.*, 2026 WL 1755170, at *7–8 (N.D. Cal. May 22, 2026).

Here, the gravamen of each of Plaintiff's claims is that Sutter's use of the Abridge platform constituted a violation of the traditionally recognized tort of invasion of privacy. *See*, *e.g.*, SAC ¶¶ 9, 39, 76–77, 113–20. That tort requires allegations showing (1) a reasonable expectation of privacy; (2) an intrusion or disclosure of the private content; (3) in a way that was highly offensive; and (4) Article III standing requires a concrete injury. *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1088 (N.D. Cal. 2022). The SAC fails to adequately plead any of these elements. *See* Sutter's concurrently filed motion to dismiss under Rule 12(b)(6), Section V.A.

**a. Plaintiff Did Not Have a Reasonable Expectation of Privacy[6]**

Where a plaintiff proceeds with medical care while knowing that her information will be collected or shared with third parties, there cannot be a reasonable expectation of privacy and thus there cannot be any concrete privacy injury for purposes of Article III standing. *See Hammerling*, 615 F. Supp. 3d at 1089 (no reasonable expectation of privacy when the plaintiff "should know" about the practice being complained of and nonetheless continues to participate in that activity); *Libman v. Apple, Inc.*, 2024 WL 4314791, at *15 (N.D. Cal. Sept. 26, 2024) (same); *Ingraham*, 2026 WL 1755170, at *8 (no concrete privacy injury where plaintiff continued to submit information despite

---

[6] Plaintiff likely will rely on an entirely different species of case in efforts to shoehorn her allegations into the types of privacy claims that have been allowed to proceed past the pleading stage on wiretapping theories. But this is not a case involving the allegedly surreptitious use of pixels to track user movements on the internet for purposes of driving advertising revenue. *Cf. In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d 1147, 1149–51 (N.D. Cal. 2025). It is not a case where the plaintiff expected her discussions would not be documented at all. *Cf. Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 233 (1998). This is not a case where a third-party human is claimed to have eavesdropped. *Cf. id.*



MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

knowing how it would be used).

The SAC does not merely fail to demonstrate an expectation of privacy—it pleads Plaintiff out of it. To cure the Original Complaint's failure to allege the Abridge platform was ever actually used during her care, Plaintiff now admits that she "personally observed a provider use microphone enabled electronic equipment while she spoke" and that "[t]he provider described the equipment as being used for transcription or for taking notes." SAC ¶¶ 6, 8 (p. 2), ¶ 34. The SAC nowhere alleges that Plaintiff questioned her provider about the use of the device, objected to it, or declined to proceed; she simply continued the encounter. *Id.* ¶¶ 5–8 (p. 1–2), ¶¶ 32–37. Plaintiff thus admits to *actual, contemporaneous knowledge*—a visible device capturing her speech, explained by her own provider in real time—followed by continued participation. If a plaintiff who merely "should know" of a practice lacks a reasonable expectation of privacy, *Hammerling*, 615 F. Supp. 3d at 1089, a plaintiff who watched the practice occur, was told what it was, and kept talking certainly lacks one.

The SAC's remaining amendments confirm that what Plaintiff now asserts is not a privacy interest at all. She concedes that her "expectation of confidentiality did not depend on believing that her provider would create no medical record," that she "expected ordinary clinical documentation," SAC ¶ 77, and that she "reasonably understood that participating healthcare personnel would hear her statements and that relevant information would be entered into her medical chart." *Id.* ¶ 35. But now she asserts an expectation that the documentation that she expected would be performed by "an internal method" rather than "a separately operated ambient AI platform." *Id.* ¶ 6 (p. 2). An expectation about the *identity of the vendor* or the *technical means* used to produce a concededly expected medical record is not an interest the common law of privacy has ever protected, and analogizing to the privacy torts "at a high level of generality" is impermissible. *Popa*, 153 F.4th at 791–92. On the SAC's own allegations, the intended content—documentation of Plaintiff's clinical encounters—reached the intended audience: her provider, her chart, and personnel within the chain of healthcare delivery. SAC ¶¶ 35, 43–45, 77.

Moreover, any expectation concerning the lack of third-party involvement is foreclosed by Sutter's NPP, which expressly informs patients that services are provided "through contracts with business associates," including "transcribing your medical record." Ex. 2 to Carkhuff Decl. (Current





MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

NPP) at 7; Ex. 3 to Carkhuff Decl. (Prior NPP) at 4. That is precisely what the SAC alleges occurred: a HIPAA business associate transcribed her encounter into a draft note for her medical record. SAC ¶¶ 44–46; Carkhuff Decl. ¶ 4. The SAC also expressly acknowledges the existence of the NPP, and Plaintiff does not contend that she did not have access to it or did not view it. *See, e.g.*, SAC ¶ 81. In fact, prior to the visits she lists in the SAC, she *signed forms* ***on three occasions***, *expressly acknowledging receipt of the NPP*. Carkhuff Decl. ¶ 14.

The SAC's rejoinder—that a "general" NPP does not establish "clear notice of live ambient recording," SAC ¶¶ 56, 81—is a legal conclusion demanding technical granularity that neither HIPAA nor the objective reasonable-expectation inquiry requires. *See* 45 C.F.R. § 164.520. And Plaintiff's own observations render that argument moot: Plaintiff did not need the NPP to tell her "a microphone would acquire the live oral communication," SAC ¶ 81—she claims she watched it happen and was told it was for transcription. *Id.* ¶¶ 6, 8 (p. 2). A patient on notice of these facts cannot maintain an objectively reasonable expectation that no third-party service would receive the audio of her visit for transcription, and any expectation of privacy in the *manner* of her documentation was patently and objectively *un*reasonable. *See, e.g.*, *Hammerling*, 615 F. Supp. 3d at 1089.

**b. Plaintiff Cannot Show Any Intrusion**

Plaintiff similarly cannot show any intrusion that would be akin to an injury at common law. A party that is voluntarily included in a conversation, and is known to the other parties to that discussion, cannot "intrude" upon that discussion. *Saedi v. SPD Swiss Precision Diagnostics GmbH*, 2025 WL 1141168, at *6 (C.D. Cal. Feb. 27, 2025); *Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1089 (W.D. Wash. 2024). Those are the circumstances here.

The SAC alleges that Plaintiff communicated medical information to her Sutter provider during treatment. SAC ¶ 5 (p. 1), ¶¶ 34–35. Plaintiff knowingly and voluntarily included Sutter in that discussion; indeed, Sutter was the intended recipient. *Id.* ¶ 35 (conceding Plaintiff "reasonably understood that participating healthcare personnel would hear her statements"). That is dispositive in this context. *Saedi*, 2025 WL 1141168, at *6; *Allen v. Novant Health, Inc.*, 2023 WL 5486240, at *2 (M.D.N.C. Aug. 24, 2023) (dismissing intrusion upon seclusion claim on the grounds that there can be no intrusion where plaintiffs acknowledge in the complaint that they voluntarily provided their

information directly to defendant).

The SAC's attempt to recharacterize routine documentation as the "acqui[sition]" of "the live oral exchange," SAC ¶¶ 39, 77, does not supply the missing intrusion. Contemporaneous capture of a clinical encounter for later transcription is a longstanding, widely understood documentation practice. *See McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 749 (7th Cir. 2010) (dictation machine recordings and transcription common in healthcare); *United States v. Azure*, 801 F.2d 336, 342 (8th Cir. 1986) (same as to transcription of examination notes); *Whalen v. Roe*, 429 U.S. 589, 602 (1977). A dictation recorder "acquires the live oral exchange" no less than the Abridge platform does; the only difference the SAC presses is that software now performs the transcription that human transcriptionists—themselves third-party business associates under the NPP—have long performed. Jones Decl. ¶¶ 9, 15–16. A change in the tool used to document a conversation in which the defendant was a voluntary, intended participant is not an intrusion into any zone of seclusion, especially when Plaintiff does not allege any disclosure of her personal information to any other person.

McDermott Will & Schulte LLP
Attorneys At Law
Los Angeles

**c. Plaintiff Cannot Show Any Public Disclosure of Her Information**

The SAC also demonstrates that Plaintiff cannot analogize her claimed injury to the tort of public disclosure of private facts. She alleges her injury "occurred when the microphone-enabled system acquired the communication without prior consent" and "does not depend on subsequent public dissemination." SAC ¶ 39. She does not claim that anyone other than Sutter and Abridge had access to her information, or that it was used for anything other than generating a clinical note for her medical chart. *See id.*

That is an express abandonment of the "public disclosure" theory as a basis for Plaintiff's privacy claims. Public disclosure of private facts requires "publicity." *McNamar*, 2026 WL 1603306, at *3; *see also Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1249 (11th Cir. 2022) (en banc) (publicity "is essential to creating the comparator tort in the first place"). Publicity means the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. Restatement (Second) of Torts § 652D (1977); *see also Hunstein*, 48 F.4th at 1245 ("[T]he harm at the core of the tort is based not on the fact that embarrassing information exists, but that the public

knows about it. So without publicity, there can be no public disclosure."). Substituting private or internal handling for publicity creates a "qualitatively different harm" that cannot support standing. *Id.* at 1249; *see also Smith v. Radius Global Sols., LLC*, 2023 WL 6373874, at *3 (C.D. Cal. Sept. 25, 2023) ("disclosure of private information absent publication—is not a historically recognized harm.").

To the extent Plaintiff relies on the transmission of her communications to Abridge itself, disclosure to a vendor engaged for a specific service is not publicity. In *Smith v. Radius Global Solutions, LLC*, the court held that a healthcare provider's sharing of information with a printing vendor did not constitute a concrete privacy injury because there was no dissemination beyond the service provider engaged for that specific purpose. 2023 WL 6373874, at *3. The Supreme Court, in *dicta*, has echoed the same sentiment. *TransUnion*, 594 U.S. at 434 n.6 (disclosure to a printing vendor was not an actionable publication historically).

This matter is no different. The SAC alleges only that Plaintiff's communications were transmitted, "[u]pon information and belief," to "infrastructure associated with the Abridge platform"—a HIPAA business associate operating under a BAA—where they "may" have been subject to review or access for purposes such as transcription, maintenance, and quality assurance. SAC ¶¶ 15, 45, 53–54; Carkhuff Decl. ¶ 4. Those allegations describe internal processing of data *consistent* with the scope of both HIPAA and the CMIA as well as the BAA between Sutter and Abridge—not a public disclosure sufficient to give rise to a cognizable injury. For these additional reasons, Plaintiff lacks Article III standing.

**d. Plaintiff Cannot Show Any Highly Offensive Intrusion**

Even if Plaintiff could plausibly allege an intrusion or a disclosure, she still lacks standing because she does not and cannot show that Sutter's conduct would be "highly offensive to a reasonable person." *Myers v. Dick's Sporting Goods, Inc.*, 2026 WL 1045528, at *3 (E.D. Cal. Apr. 17, 2026) (quotations and citations omitted). Courts have long recognized that the "highly offensive" inquiry turns on whether the conduct meaningfully departs from social norms and reasonable expectations of privacy. *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009). The SAC alleges no such departure. The use of patient information in a manner consistent with ordinary healthcare operations, patient expectations, the privacy notice of the healthcare provider, and California and federal law is



MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

not comparable to the type of egregious conduct historically required to sustain an invasion of privacy claim.

Plaintiff's own allegations (and the evidence Sutter submits) confirm that the challenged practices fall squarely within routine and disclosed healthcare operations. Sutter's practice is to regularly provide its NPP (which is also available on its website) to patients prior to treatment; and Plaintiff indeed received the NPP and signed an acknowledgment form ***three times*** confirming receipt prior to her visits. Carkhuff Decl. ¶ 14. The NPP expressly informs patients that their information may be used and disclosed to business associates for, *inter alia*, transcribing medical records. Ex. 2 to Carkhuff Decl. (Current NPP) at 7; Ex. 3 to Carkhuff Decl. (Prior NPP) at 4. Having notice of these practices—and, by her own account, having watched the device capture her speech while her provider explained its function, SAC ¶¶ 6, 8 (p. 2)—Plaintiff cannot plausibly claim that those same disclosed and expected practices are "highly offensive." *See, e.g.*, *Hill v. NCAA*, 7 Cal. 4th 1, 26 (1994) (noting that in an invasion of privacy case where consent is given, conduct will rarely be found highly offensive so as to justify tort liability).

The SAC's insinuation that the provider's explanation was misleading because it "did not disclose that a third-party ambient AI service was acquiring the live communication," SAC ¶ 82, only underscores the absence of offensive conduct. Plaintiff does not—and cannot—allege that the provider's description was false: the equipment was, by her own account, being used to transcribe the visit and generate clinical notes. *Id.* ¶ 6 (p. 2), ¶¶ 43–45. And no legal authority requires a provider to recite the corporate identity of each business associate or the software architecture of each documentation tool. *See, e.g.*, 45 C.F.R. § 164.520; 45 C.F.R. § 164.502(e)(1) (HIPAA requires disclosure of business associates by category, not by specific corporate identity).

Nor could a reasonable person otherwise find Sutter's alleged conduct offensive. Federal and California law allow third-party service providers to perform essential healthcare functions. *See* 45 C.F.R. § 164.502(e)(1); Cal. Civ. Code § 56.10(c)(3). In other words, Plaintiff challenges the propriety of the careful legislative balance struck by both federal and California authorities in determining when patient information can be disclosed. *See* Mot. to Dismiss under Rule 12(b)(6), Section V.D.3. Her theory would convert standard, statutorily permitted healthcare practices into tortious conduct. Indeed,

on the record before the Court, the platform *reduced* the number of human beings exposed to the contents of Plaintiff's visit relative to the traditional documentation chain she concedes she expected. Jones Decl. ¶¶ 9–16. Conduct that narrows the audience for concededly expected documentation is not conduct a reasonable person could find "highly offensive."

Because the SAC is bereft of conduct that a reasonable person could regard as highly offensive, it lacks the defining feature of the privacy torts that Plaintiff relies on. Accordingly, Plaintiff lacks Article III standing.

**e. Plaintiff Cannot Show Any Emotional or Economic Harm**

To establish standing, a plaintiff must plausibly allege a concrete injury. Under *Twombly* and *Iqbal*, a complaint must allege facts—not labels or formulaic recitations—that make the asserted injury plausible. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Courts routinely reject claims of emotional distress or economic loss that are untethered to concrete facts or to harms recognized at common law. *See, e.g.*, *Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090, 1097 (N.D. Cal. 2011); *In re Facebook Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 782–84 (N.D. Cal. 2019).

Even after amending her complaint twice, Plaintiff's allegations of emotional harm remain entirely conclusory—indeed, they are copied nearly verbatim from the Original Complaint, despite Sutter's prior motion notifying Plaintiff of its deficiencies. *Compare* Orig. Compl. ¶ 97, *with* SAC ¶ 120. Plaintiff only makes the barebones statement that she suffered "emotional distress, mental anguish, anxiety, anger, [and] humiliation." SAC ¶ 120; *see also id.* ¶¶ 61, 95. But she does not explain how or why that harm occurred, nor does she include any specific *facts* supporting her assertions. She does not allege public exposure, reputational injury, or any circumstance historically associated with emotional injury in privacy cases. She merely asserts—without explanation—that routine clinical documentation, which she concedes she expected and observed, caused severe emotional harm. Those circumstances do not make it plausible that Plaintiff suffered any emotional distress. *See Maghoney v. Dotdash Meredith, Inc.*, 2026 WL 497402, at *7 (S.D. Cal. Feb. 23, 2026) (rejecting bare allegations of emotional injury stemming from alleged misuse of medical information where the conclusory allegations failed to include any detail or specific claims of genuine injury); *Cohen*, 798 F. Supp. 2d at 1097 (dismissing conclusory allegations of harm unsupported by factual



MCDERMOTT WILL & SCHULTE LLP
ATTORNEYS AT LAW
LOS ANGELES

detail).

Plaintiff's economic injury theory fails for the same reason. The SAC alleges, in formulaic terms, that she "lost money or property" by paying "fees for medical services" rendered. SAC ¶ 109. But the SAC does not allege she paid more, received diminished care, or relied on any representation regarding how her information would be documented. Nor does it specify what her actual (alleged) economic loss was; there is no mention of additional bills, payments, or *anything* else. Courts reject this type of theory as insufficient. In *In re Facebook*, for example, the court dismissed claims where plaintiffs alleged economic harm but failed to connect that theory to any actual loss or diminished value. 402 F. Supp. 3d at 782–84. The same is true here. Plaintiff's allegation that she paid for medical care—care that she does not allege was deficient—does not plausibly establish a cognizable economic injury tied to the alleged conduct.

Because Plaintiff does not plausibly allege emotional or economic harm stemming from her purported privacy injury that bears a close relationship to a traditionally recognized injury, she does not have Article III standing, and her claims should be dismissed.

## VI. CONCLUSION

For the foregoing reasons, all of Plaintiff's claims should be dismissed pursuant to Rule 12(b)(1) for lack of Article III standing.

Dated: August 19, 2026

Respectfully submitted,

**MCDERMOTT WILL & SCHULTE LLP**

By: */s/ J. Jonathan Hawk*

J. JONATHAN HAWK
ARI R. SWAZER
2049 Century Park East
Suite 3200
Los Angeles, CA 90067-3206
Telephone: +1 310 277 4110
Facsimile: +1 310 277 4730

DAVID P. SAUNDERS (*pro hac vice*)
dsaunders@mcdermottlaw.com
**MCDERMOTT WILL & SCHULTE LLP**
444 West Lake Street, Suite 4000
Chicago, IL 60606-0029
Telephone: +1 312 372 2000
Facsimile: +1 312 984 7700

*Attorneys for Defendant*
SUTTER HEALTH